In re AMERICAN FREIGHT
SYSTEM, INC., Debtor.

AMERICAN FREIGHT SYSTEM,
INC., Plaintiff,

v.

VALIANT PRODUCTS
CORP., Defendant,

AMERICAN FREIGHT SYSTEM,
INC., Plaintiff,

v.

LUETZOW INDUSTRIES, Defendant.

Bankruptcy No. 88–41050–11.
Adv. Nos. 90–7289, 90–7351.

United States Bankruptcy Court,
D. Kansas.

Aug. 8, 1995.

---

Richard Wallace, Evans & Mullinix, Lenexa, KS.

Richard P. Bourne, Hunter & Sommers, Waukesha, WI.

Kurt Stohlgren, Hillix, Brewer, Hoffhaus, Whittaker & Wright, Kansas City, MO.

## ORDER DENYING SUMMARY JUDGMENT MOTIONS

JAMES A. PUSATERI, Chief Judge.

These proceedings are before the Court on motions for summary judgment based on the small-business concern defense created by Congress in the Negotiated Rates Act of 1993. Valiant Products Corporation (Valiant), a defendant in Adversary No. 90–7289, and Luetzow Industries (Luetzow), a defendant in Adversary No. 90–7351, have filed motions based on the same legal theory and American Freight System, Inc. (AFS), the plaintiff-debtor, has raised the same arguments in opposing both motions. Valiant appears by counsel Joseph M. Weiler. Luetzow appears by counsel Richard P. Bourne and Richard C. Wallace. AFS appears by counsel Kurt Stohlgren. The Court has reviewed the relevant pleadings, and is now ready to rule.

### FACTS

In these proceedings, AFS seeks to recover freight charges based on transportation services it provided to Valiant and Luetzow. The amounts of the charges were supposed to be fixed by tariffs which AFS was to have on file with the Interstate Commerce Commission. AFS alleges in its briefs and through the sworn affidavits of a corporate officer that it seeks to recover from each defendant some charges based on "original unpaid receivables" and others based on "undercharges." It also asserts in both briefs that it is not seeking to collect the difference between rates negotiated and paid, and rates reflected in its tariffs on file with the ICC, but only the affidavit filed in Valiant's case supports this assertion. AFS has not otherwise explained what its officer means by "original unpaid receivables" or "undercharges."

Joseph M. Weiler, Alderson, Alderson & Montgomery, L.L.C., Topeka, KS.

Valiant and Luetzow both seek to take advantage of a provision of the NRA based on their possible status as small-business concerns. They contend their status relieves them from liability for all the freight charges AFS seeks to recover. Valiant submitted the affidavit of its "traffic manager," who asserts that the company has less than 500 employees. He does not state what business Valiant is engaged in. AFS has filed a motion to strike the affidavit because it does not indicate it is based on personal knowledge and because it asserts an unsupported conclusion "concerning the ultimate facts and law in issue as to defendant's status as a small business concern." Luetzow submitted two affidavits to support its claim to be a small-business concern, but through some mix-up, each affidavit appears to have been signed by the person who was supposed to sign the other one. AFS has moved to strike these affidavits due to the switched signatures and their allegedly improper conclusions of law.

AFS also raises two procedural complaints about the defendants' small-business defense. First, it contends the NRA required the defendants to notify it of their election to rely on the defense; since they did not, AFS argues they may no longer assert it. Second, it contends they have failed to properly plead their small business status as an affirmative defense. It appears Valiant first raised the defense at a pretrial conference in April 1995, and Luetzow in its summary judgment motion, filed in May 1995. AFS states that it is prejudiced by the assertion of the defense at this point, without explaining how it is prejudiced. It adds that assertion of the defense will make additional discovery necessary.

DISCUSSION AND CONCLUSIONS

A. The Affidavits

■ The problems with both defendants' affidavits preclude the Court from determining on summary judgment motions that they qualify as small-business concerns under the NRA, which incorporates the Small Business Act's definition of such a business. In fact, it does not appear that either defendant has attempted to establish all the criteria required to qualify as a small-business concern

under 15 U.S.C.A. § 632(a)(1) and (2). *See Scroggins v. Southern Wipers (In re Brown Transport Truckload), 176 B.R. 82, 89 (Bankr.N.D.Ga.1994) ("small-business concern" is one that is independently owned and operated, not dominant in its field of operation, and satisfies Small Business Administration criteria for number of employees or dollar volume of business).* The Court could end this decision with that ruling, but chooses instead to address certain other issues the parties have raised which will affect these and other pending cases in the future.

B. Relevant Provisions of the NRA

After it filed for bankruptcy, AFS filed over one thousand adversary proceedings in which it sought to recover charges for transporting freight. Late in 1993, Congress passed and the President signed into law the Negotiated Rates Act of 1993 (NRA). *P.L. No. 103–180, 1993 U.S.C.C.A.N. (107 Stat.) 2044 to 2053 (codified at 49 U.S.C.A. § 10701(f), in a note to § 10701, and at scattered sections of title 49).* At least potentially, the NRA could affect AFS's claims for such charges. Section 2 of the NRA is labelled "Procedures for Resolving Claims Involving Unfiled, Negotiated Transportation Rates," and subsection (a) of § 2 adds new subsection (f), which carries the same label, to § 10701. For present purposes, only the following paragraphs of subsection (f) are relevant.

(1) In General.—When a claim is made by a motor carrier of property ... providing transportation subject to the jurisdiction of the [ICC] under subchapter II of chapter 105 of this title ... regarding the collection of rates or charges for such transportation in addition to those originally billed and collected by the carrier ... for such transportation, the person against whom the claim is made may elect to satisfy the claim under the provisions of paragraph (2), (3), or (4) of this subsection, upon showing that—

(A) the carrier ... is no longer transporting property ...; and

(B) with respect to the claim—

(i) the person was offered a transportation rate by the carrier ... other than that legally on file with the [ICC] for the transportation service;

(ii) the person tendered freight to the carrier ... in reasonable reliance upon the offered transportation rate;

(iii) the carrier ... did not properly or timely file with the [ICC] a tariff providing for such transportation rate or failed to enter into an agreement for contract carriage;

(iv) such transportation rate was billed and collected by the carrier ...; and

(v) the carrier ... demands additional payment of a higher rate filed in a tariff.

· · · · ·

Paragraphs (2) and (3) permit shippers to satisfy such carrier claims by paying 20% or 15% of the amount sought, depending on the weight of the shipment. Paragraph (4) provides that "[n]otwithstanding paragraphs (2) and (3)," persons who are "public warehousemen" may satisfy such claims by paying 5% of the amount sought. Subsection (f) later provides:

(7) Limitation on Statutory Construction.—Except as authorized in paragraphs (2), (3), (4), and (9) of this subsection, nothing in this subsection shall relieve a motor common carrier of the duty to file and adhere to its rates, rules, and classifications as required in sections 10761 and 10762 of this title.

(8) Notification of Election.—

(A) General Rule.—A person must notify the carrier ... as to its election to proceed under paragraph (2), (3), or (4). Except as provided in subparagraphs (B), (C), and (D), such election may be made at any time.

· · · · ·

(C) Pending Suits for Collection Made Before Or On Date of Enactment.—If the carrier ... has filed, before or on the date of the enactment of this subsec-

tion, a suit for the collection of additional freight charges and notifies the person from whom additional freight charges are sought of the provisions of paragraphs (1) through (7), the election must be made not later than the 90th day following the date on which such notification is received.

· · · · ·

(9) Claims Involving Small–Business Concerns, Charitable Organizations, and Recyclable Materials.—Notwithstanding paragraphs (2), (3), and (4), a person from whom the additional legally applicable and effective tariff rate or charges are sought shall not be liable for the difference between the carrier's applicable and effective tariff rate and the rate originally billed and paid—

(A) if such person qualifies as a small-business concern ...,

(B) if such person is [a charitable organization described in certain provisions of the Internal Revenue Code], or

(C) if the cargo involved in the claim is recyclable materials ...

Subsection (e)(1) of § 2 of the NRA establishes another procedure for resolving a carrier's claim for the difference between its properly filed tariff rate and the rate it negotiated for its services if the carrier is no longer transporting property between places described in 49 U.S.C.A. § 10521(a)(1).[1] This procedure requires the ICC to determine whether the carrier's action constitutes an "unreasonable practice" under § 10701; the difference is uncollectible if the action is an "unreasonable practice." Subsection (e)(2) of § 2 directs the ICC, in making this determination, to consider whether circumstances essentially identical to those listed in § 10701(f)(1)(B) exist. Subsection (e)(5) provides that the § 10701(f) procedure is not available if enforcement of subsection (e)(1) is sought.

**1.** Rather than being codified, NRA § 2(e) has been placed in the United States Code as a note to § 10701.

### C. The Issues Raised by the Parties in These Proceedings

*1. Must shippers notify carriers of their election to rely on paragraph (9) of § 10701(f)?*

AFS argues neither Valiant nor Luetzow may assert the small-business concern defense because neither notified AFS of its election to resolve AFS's claims under § 10701(f)(9). It points out that NRA § 2(e)(5) provides that an election to proceed under § 2(e)(1) makes § 10701(f) inapplicable. However, AFS does not assert that either defendant elected to proceed under § 2(e)(1), so § 2(e)(5) is irrelevant to these cases.

■■■ AFS also refers to this Court's order which directed AFS to give the defendants in its freight charge collection cases the notice required by subparagraph (8)(C) of § 10701(f) to trigger a time limit for the defendants to elect to satisfy AFS's claims under paragraphs (2), (3), or (4). However, subparagraph (8)(A) provides that notice must be given only of an election to proceed under (2), (3), or (4). Paragraph (9) is not included. While carriers might have reasons to prefer that shippers be required to notify them that they claim to be small-business concerns or otherwise protected by paragraph (9), no provision in the NRA requires them to do so. Indeed, the notice required to trigger the election time limit is notice of paragraphs (1) to (7), not of (9). Furthermore, the NRA broadly provides shippers with two new options for resolving freight undercharge claims: (1) pay 5, 15 or 20 percent of the amount sought, or (2) go to the ICC and try to prove that the carrier's claims constitute an "unreasonable practice," which would excuse the shipper from paying any charges. These options present a real choice, so it makes sense for Congress to require shippers to "elect" which procedure to follow. Paragraph (9), however, provides a complete exemption from the charges based on more straightforward criteria than whether a carrier engaged in an "unreasonable practice," namely, whether the shipper qualifies as a "small-business concern" or a charitable organization, or whether the goods shipped qualify as "recyclable materials."

Where these criteria are met, the shipper has no true "election" to make, but will certainly choose to easily avoid liability rather than spend money to go to the ICC and risk the ICC's determination of the "unreasonable practice" question. Unlike the showing discussed below in issue three, the Court sees nothing in the NRA about this issue which suggests this procedural notice of election provision should extend to paragraph (9).

*2. Did the defendants waive the small-business concern defense by failing to plead it in an answer?*

■■■ AFS argues the defendants' small-business concern status is an affirmative defense which they have waived by failing to plead it in any answer. Of course, Congress created the defense by enacting the NRA over three years after these adversary proceedings were filed. Federal Rule of Civil Procedure 15(d), made applicable here by Federal Rule of Bankruptcy Procedure 7015, governs the filing of supplemental pleadings to set forth events which have happened since the filing of the pleading sought to be supplemented. The Court has discretion to allow such supplemental pleadings, and should generally exercise this power in favor of granting leave; if necessary, the Court can fashion terms to prevent prejudice to the opposing party. *6A Wright, Miller & Kane, Fed.Prac. & Pro.Civil 2d, § 1510 (1990); see also 6 Fed.Prac. & Pro.Civil 2d, § 1487 (discussing when leave to amend pleadings should be granted or denied).* While summary judgment motions are not supplemental answers, the Court believes they effectively serve that function in these cases and will not require the defendants to file formal supplemental answers. The only significant prejudice to AFS in allowing the defendants to raise the defense now would be the added cost and delay arising from the need to conduct discovery about the defendants' small-business status and the possible loss of its claims if the defense is successful. This prejudice, however, was created when Congress passed the NRA, not by the defendants' actions. Valiant and Luetzow have not added measurably to the prejudice by waiting to assert the defense until sixteen to seventeen

months after the NRA took effect. That delay should not have increased the difficulty of proving whether they qualify as small-business concerns. The Court concludes the defendants should be allowed to raise the defense. The Court will give AFS thirty days to conduct discovery on their claims to qualify as small-business concerns.

*3. Must shippers prove that the carrier suing them is no longer transporting property under § 10701(f)(1)(A) and that the charges sought meet the criteria set out in § 10701(f)(1)(B) in order to be exempted from the charges under § 10701(f)(9)?*

■ Valiant and Luetzow contend that under the NRA, they can exempt themselves from all AFS's charges simply by showing that they are small-business concerns under the Small Business Act, 15 U.S.C.A. § 631, *et seq.* AFS contends they must also make the showings required by § 10701(f)(1)(A) and (B). A number of courts, including the Eighth Circuit, have rejected carriers' arguments that small-business concerns relying on § 10701(f)(9) must make the showing required by (f)(1)(A) that the carrier is no longer transporting property. *Jones Truck Lines v. Whittier Wood Products (In re Jones Truck Lines),* 57 F.3d 642, 647–49 (8th Cir.1995); *De'Medici v. FDSI Management Group (In re Lifschultz Fast Freight Corp.),* 174 B.R. 271, 273–74 (N.D.Ill.1994); *North Penn Transfer v. Polykote Corp.,* 170 B.R. 565, 567–68 (E.D.Pa.1994); *Hoarty v. Midwest Carriers (In re Best Refrigerated Express),* 168 B.R. 978, 984–85 (Bankr.D.Neb. 1994); *see also North Penn Transfer v. ATD–American Co.,* 175 B.R. 168, 170–71 (E.D.Pa.1994) (rejecting assertion NRA is conditioned on financial condition of carrier, court ruled small business exemption does not require showing that carrier is no longer transporting property); *Scroggins v. Southern Wipers (In re Brown Transport Truckload),* 176 B.R. 82, 85–86 (Bankr.N.D.Ga. 1994) (same); *Jones Truck Lines v. Polyflex*

*Film & Converting,* 173 B.R. 576, 580–81 (S.D.Miss.1994) (rejecting assertion small business exemption is conditioned on insolvency or financial condition of carrier, court ruled company need only show it is qualified small business to obtain the exemption). Only one court has been faced with the argument that a small-business concern must not only show that the carrier is no longer transporting property but also that the charges sought to be collected satisfy the requirements of (f)(1)(B); that court did reject both assertions. *Adrian Waldera Trucking v. Quality Liquid Feeds,* 848 F.Supp. 853, 855–56 (W.D.Wis.1994).[2] After careful consideration of the provisions of the NRA and its legislative history, the Court must respectfully disagree with all these courts.

The Eighth Circuit's decision in *Jones Truck Lines,* 57 F.3d 642, 647–49 fairly reflects the reasoning applied by all these courts in reaching their conclusions. The Court will describe that ruling before explaining its own reasons for disagreeing. Jones Truck Lines, Inc. (Jones), appealed a summary judgment ruling that the Negotiated Rates Act of 1993 (NRA) precluded it from recovering undercharges from shippers. Insofar as relevant here, Jones argued that shippers claiming the small business exemption under 49 U.S.C.A. § 10701(f)(9) had to show that the carrier making undercharge claims against them had ceased operations before they could use the exemption, that is, they had to make the showing required under subparagraph (f)(1)(A). The 8th Circuit began its analysis by noting paragraphs (2), (3), and (4) are referred to in paragraph (1), which explicitly requires a shipper to prove the carrier is not transporting property before the shipper may choose to settle under one of those paragraphs. Paragraph (9), the Circuit pointed out, is not listed in paragraph (1). Jones argued that because paragraph (9) is available "notwithstanding paragraphs (2), (3), and (4)," one of those paragraphs

---

**2.** In a summary judgment decision, Chief District Judge Van Bebber of this district ruled a shipper had established that it was a qualified small-business concern under the NRA and said it did not need to make any additional showing to rely on the exemption. *Lewis v. Squareshooter Candy Co.,* 176 B.R. 54, 56–57 (D.Kan.1994). However,

it appears that the plaintiff-trustee was arguing only that the shipper was not a qualified small-business concern and that the NRA violated the carrier's constitutional rights. The statement that no additional showing was required was not a holding that the § 10701(f)(1)(A) and (B) showings need not be made.

would have to be applicable before the shipper could exercise the exemption in paragraph (9). The Circuit then pointed out that in paragraph (7), Congress did include paragraph (9) along with (2), (3), and (4), and said Congress would also have included paragraph (9) in paragraph (1) if it meant to make the small business exemption contingent on the carrier's status. Finally, the Circuit said any ambiguity in the text is resolved by legislative history indicating that Congress wanted to exempt paragraph (9) companies from "undercharge claims." Although the Circuit was directly considering only whether a shipper must make the showing required under subparagraph (1)(A), its reasoning seems just as applicable to (1)(B).

■ The Court believes this seemingly reasonable analysis is flawed. First, while paragraph (9) is not included in paragraph (1), paragraph (9) itself says it applies "notwithstanding paragraphs (2), (3), and (4)." Paragraph (1) is omitted from this listing. Yet, paragraph (1) clearly says paragraphs (2), (3), and (4) do not apply unless the shipper makes the showings specified in subparagraphs (A) and (B) of paragraph (1). So if Congress had meant to make paragraph (9) apply without regard to paragraph (1), it did not need to make paragraph (9) apply "[n]otwithstanding paragraphs (2), (3), and (4)," but instead should have made it apply "notwithstanding paragraph (1)." While it is true that paragraphs (2), (3), (4), and (9) are all listed in paragraph (7), this fact does not explain what the "notwithstanding" phrase in paragraph (9) means. The Circuit's construction makes the phrase meaningless, violating a standard canon of statutory construction that courts should construe a statute to give effect to all its words. *See Rake v. Wade,* 508 U.S. ——, ——, 113 S.Ct. 2187, 2192, 124 L.Ed.2d 424, 433 (1993); *Pennsylvania Dept. of Public Welfare v. Davenport,* 495 U.S. 552, 562, 110 S.Ct. 2126, 2132–33, 109 L.Ed.2d 588 (1990). Instead, the "notwithstanding" phrase suggests that paragraph (9) is an exception to paragraphs (2), (3), and (4), but is subject to paragraph (1). In addition, another facet of the wording of paragraph (9) suggests that Congress at least *might* have intended for paragraph (1) to apply to that paragraph. The second

phrase in paragraph (9), "a person from whom *the* additional legally applicable and effective tariff rate or charges are sought," suggests that Congress had in mind in paragraph (9) a group of charges previously identified in the statute. Grammatically, the use of "the" in this phrase is appropriate only when the additional charges referred to have been previously identified. Under the Eighth Circuit's construction, the phrase should use an indefinite article or word like "an" or "some" or "any," rather than the definite article "the." The most obvious reference would be back to the kind of rates or charges described in subparagraph (1)(B). Consequently, this Court is convinced the omission of paragraph (1) from the first phrase of paragraph (9) is as significant as the omission of paragraph (9) from paragraph (1), and must conclude the omissions make the statute ambiguous. A simple literal reading of the statute does not reveal its true meaning.

The overall structure of § 10701(f) leads this Court to believe it is more reasonable to read paragraph (9) as applying only if the paragraph (1) showings are made. The arrangement of the paragraphs suggests that Congress intended to define in paragraph (1) all the charges governed by the subsection, to provide in paragraphs (2) and (3) partial exemptions from those charges, to provide in paragraph (4) an exception to (2) and (3) which gives a greater exemption for a limited group of charges, and then to provide in paragraph (9) an exception to (2), (3), and (4) which gives a complete exemption for another limited group. This view of the statute explains the purpose of the "[n]otwithstanding" phrases that begin paragraphs (4) and (9). It also comports with the labels Congress used, "In general" for paragraph (1), and "Claims involving ..." for paragraphs (2), (3), (4), and (9).

■ Perhaps more importantly, construing paragraph (9) to be subject to paragraph (1) limits the application of § 10701(f) to the kind of carrier claims that led Congress to enact the NRA. The interpretation adopted by the Eighth Circuit and other courts cited above appears to exempt small-business con-

cerns, charitable organizations, and shipments of recyclable materials from any charges sought beyond those originally billed and paid, even if the shipper had no reason to believe the amount it had paid was all it owed. For example, if the carrier simply made a mistake and billed the shipper too little, the shipper could rely on paragraph (9) to avoid paying the additional amount even though it had no agreement to pay the amount the carrier billed. The Court believes Congress was concerned only with charges sought in addition to those agreed to by the parties to a shipment (that is, negotiated rates), and not additional charges based on something else, like the correction of a mistake. *See H.R.Rep. No. 359, 103d Cong., 1st sess., pp. 7–9, reprinted in 1993 U.S.C.C.A.N. 2534, 2534 to 2536.* After all, the new statute is called the *Negotiated Rates Act of 1993. See* NRA § 1.

 The legislative history relied on by the Eighth Circuit, properly understood, actually supports this Court's contrary view of the statute. Both statements the Circuit quoted indicate Congress wanted to exempt small businesses, charitable organizations, and recyclers from "undercharge" claims. *See 57 F.3d at 648 (quoting H.R.Rep. No. 359, 103d Cong., 1st Sess. 10, reprinted in 1993 U.S.C.C.A.N. 2534, 2537 and 139 Cong. Rec. S16187 (Nov. 18, 1993) (Statement of Senator Danforth)).* The Court believes the word "undercharge" is simply a short-hand way to refer to the types of charges described in § 10701(f)(1)(B), and was not meant to refer to all additional charges of any kind that a carrier might seek to recover from a shipper. Thus, statements in the legislative history about "undercharges" comport with this Court's construction of the statute. The House Report on the NRA declared, "The purpose of [the House bill which was mostly included in the Senate bill that passed] is to provide a statutory process for resolving disputes for claims involving negotiated transportation rates brought about by trustees for non-operating motor carriers for past transportation services." *H.R. No. 359 at 7, reprinted in 1993 U.S.C.C.A.N. at 2534.* This statement further indicates the provisions of (f)(1)(A) and (B) were included to establish the scope of

the NRA, and should raise doubts about applying any part of the Act to operating carriers or to rates not negotiated by the parties.

As indicated, the Eighth Circuit and all but one of the other courts which considered the NRA's small business exemption were faced only with arguments based on the "no longer transporting property" provision in § 10701(f)(1)(A). Perhaps the carriers involved in those cases all conceded the charges they were trying to collect met the criteria of subparagraph (1)(B). By contrast, although AFS has already been determined to be "no longer transporting property," *American Freight System v. ICC (In re American Freight System),* 174 B.R. 604 (Bankr.D.Kan.1994) (Robinson, J.), (it has appealed that ruling), it does argue that at least some of the charges it seeks do not satisfy subparagraph (1)(B). Had those courts been informed their rulings appeared to permit small-business concerns to avoid liability for charges they knew or should have known they owed, and not just for charges in addition to those they thought were all they owed because of their agreements with carriers, the courts might well have reached different conclusions about paragraph (9).

In the alternative, the Court believes it is possible, though less reasonable on the whole, to accept the conclusion that the omission of paragraph (9) from paragraph (1) means shippers need not show the carrier is no longer transporting property, but still conclude they must show the charges sought meet the criteria set out in subparagraph (1)(B). As indicated above, the use of the definite article "the" in paragraph (9) indicates the charges mentioned there have been identified previously, and the most obvious reference would be back to those charges described in subparagraph (1)(B). Under this construction based on language that does appear in paragraph (9), even though they would not have to show that AFS is no longer transporting property, Valiant and Luetzow would still need to show that AFS offered them a rate not on file with the ICC, they tendered freight in reliance on the offered rate, AFS did not properly file the offered rate, AFS billed them for the offered

rate and they paid it, and AFS is now demanding they pay some higher rate that was on file.

D. Conclusion

The defendants' motions for summary judgment must be denied because: (1) their affidavits are insufficient, and (2) they have not even attempted to show that the charges AFS seeks to recover from them satisfy the criteria set by 49 U.S.C.A. § 10701(f)(1)(B). They were not, however, required to make any election to rely on the small-business concern exemption, and have adequately raised the exemption as an affirmative defense to AFS's claims. AFS shall have thirty days from entry of this order to conduct discovery on the defendants' status as small-business concerns.

IT IS SO ORDERED.